Strafford
No. 83-126

THE STATE OF NEW HAMPSHIRE

v.

RODNEY PORTIGUE

August 9, 1984

*Gregory H. Smith*, attorney general (*Gregory W. Swope*, assistant attorney general, on the brief and orally), for the State.

*Levine & Rubega*, of Sanbornville (*Alfred J. T. Rubega* on the brief and orally), for the defendant.

KING, C.J. The defendant, Rodney Portigue, appeals his conviction by a jury in the Strafford County Superior Court (*Temple*, J.) of the misdemeanor of endangering the welfare of his child in violation of RSA 639:3, I (Supp. 1983). The defendant was sentenced to one year in the house of correction. The questions presented are: (1) whether the defendant's motion for a bill of particulars was properly denied; (2) whether the defendant's rights protected by the Fifth and Fourteenth Amendments of the United States Constitution were violated; (3) whether the defendant's motions for mistrial were correctly denied; and (4) whether the evidence was sufficient to support the jury's verdict. For the reasons that follow, we affirm.

The following facts have been adduced from the hearing on the motion to suppress and, for the purpose of determining the sufficiency of the evidence, from the trial record. On January 9, 1982, at approximately 1:00 a.m., the defendant entered the emergency room of the Frisbie Memorial Hospital in Rochester carrying his daughter Amy Portigue, a child, in his arms. The defendant told the emergency medical technician on duty at the hospital that his daughter needed to be examined because his wife had been severely disciplining the child for the preceding two weeks.

A nurse brought the defendant into a trauma room where the child was undressed and examined. Both the nurse and the medical technician observed that the child exhibited extensive bruising, including discoloration and puffing around the eyes, and was not breathing. In response to the nurse's inquiry about the child's condition, the defendant stated "[s]he's been beating her" for "[o]ver a week." He also told the nurse that "I should have taken her away from her a long time ago." The defendant was then ushered into the waiting room by hospital personnel.

After the child failed to respond to cardiopulmonary resuscitation conducted by the emergency room physician, the child was pronounced dead at 1:12 a.m. The autopsy performed on the child later that morning by the Strafford County medical examiner revealed multiple bruises over all of her body surfaces, including black eyes and other facial bruises, which were apparently inflicted over a two- to fourteen-day period prior to the child's death. The medical examiner testified that the bruises he observed on the child were consistent with the child's being kicked, and being beaten with straps and human hands. The medical examiner also observed a crusted laceration of the child's scalp, about one-and-one-half inches long, which formerly had been a gaping wound, and which was consistent with a child's falling onto a sharp object. The autopsy further revealed a prominent abrasion on the child's chin, two to five days in age, and gangrenous toes. The internal examination of the child produced evidence of trauma.

At approximately 1:25 a.m., while the defendant sat in the waiting room of the hospital emergency area, he was approached by Rochester Police Sergeant Cook and advised of his *Miranda* rights. *Miranda v. Arizona*, 384 U.S. 436 (1966). Since Officer Cook was not in possession of a so-called *Miranda* form at the time of the interview, a written waiver of the defendant's *Miranda* rights was not executed until a later time. The interview of the defendant was conducted in the presence of another police officer, who was standing by the swinging doors in the waiting room which led to the main emergency area. There are two other exits in the waiting room: a hallway which leads to the main corridor of the hospital and a set of glass doors which exit directly onto the street. Officer Cook testified that the defendant was free to leave the hospital during the course of the interview.

In response to Officer Cook's questioning regarding the condition of the child, the defendant described the child's respiratory illness. After briefly discussing the reasons for his decision to bring the child to the hospital, the defendant, according to Officer Cook's testimony, paused. Officer Cook testified that the following colloquy

with the defendant then occurred: "I told him it's quite obvious that beatings and bruises and other things had taken place, and he said, 'I don't want to get her in trouble.'" Officer Cook informed the defendant that if he did not disclose the complete story surrounding the child's condition, the defendant "could probably be into some problems" with the Rochester Police Department. Thereupon, the defendant responded, "Okay, I'll tell you," and proceeded to tell Officer Cook that "his wife . . . had been beating the child . . . for the past several months."

After the "pause" in the interview and before the defendant's decision to disclose his wife's beatings of the child, Officer Cook did not reassert the *Miranda* warnings. On cross-examination, Officer Cook stated that he did not interpret the defendant's assertion that he did not want to get his wife into trouble as an indication that the defendant wished to terminate any further discussions with the police.

> "Q: So at that point when he indicated he didn't really want to go any further with his story, you did, essentially, [state] that he could get into a lot of trouble if he didn't?
>
> A: Mr. Portigue was relating to me a story, and it was a pause, a natural pause. I just asked him if there was more to the story, and he told me the rest of the story."

The defendant also told Officer Cook that he was aware of the beatings and had also observed some of the beatings performed by his wife. Despite these observations, the defendant told Officer Cook that "he had not taken any action to report the beatings because he was afraid of getting his wife and/or himself in trouble."

Subsequently, at approximately 1:50 a.m., Officer Cook obtained a *Miranda* form and sought to memorialize in writing the defendant's earlier oral waiver of his *Miranda* rights. Initially, the defendant indicated on the form that he did not wish to speak with Officer Cook. Upon Officer Cook's inquiry, the defendant told Officer Cook: "After talking with my wife I don't wish to speak with you." Whereupon Officer Cook explained to the defendant that the time entered on the *Miranda* form—1:25 a.m.—represented the defendant's earlier oral waiver. The defendant then agreed to execute the retroactive written waiver on a second form. The first form was discarded by Officer Cook.

Officer Cook later informed his superiors who were present at the hospital, Captain Hall and Lieutenant Winship, of the defendant's refusal to speak further with police due to the defendant's conversa-

tion with his wife. However, Officer Cook also told the detectives that it was his impression, based on his earlier conversation with the defendant, that the defendant would in fact talk with the detectives. Officer Cook testified:

"When we first held our . . . talk, after being given the *Miranda*, I found him very easy to talk with and, you know, very calm. Then between 1:45 and 2 o'clock, after he had spoken with his wife, he was very nervous. He gave me the impression verbally that after he had talked with his wife that she had determined that he wasn't going to talk with anyone, and I felt that if the detectives got a chance to talk with Mr. Portigue that . . . he would in fact talk with them. I felt that he was getting pressure from his wife not to speak."

Later, the defendant was brought into a small office in the emergency area by a police officer, where he was interviewed by Captain Hall in the presence of Lieutenant Winship and County Attorney May. At approximately 3:00 a.m., Captain Hall advised the defendant of his *Miranda* rights. Captain Hall's testimony described the defendant's responses to questioning as rational and coherent. The defendant again stated that his daughter's bruises were inflicted by his wife and that one month earlier he had oberved his wife strike the child with a strap and kick her in the chest. The defendant also said that he had observed his wife push the child against a wall. The defendant further stated that the beatings had occurred since the preceding summer. The defendant also disclosed that he had observed a bleeding wound on the back of the child's head approximately two weeks prior to the child's death.

A written statement of the defendant's remarks during the course of the interview, compiled by Lieutenant Winship, was signed by the defendant at the completion of the interview after the defendant had corrected the statement's text. The written statement indicated that the defendant had been advised of his *Miranda* rights.

At the conclusion of the interview, the defendant walked to the hospital front lobby to talk with his wife. There was testimony from County Attorney May and Captain Hall that the defendant and his wife were "free to come and go as they wished."

Later, upon the defendant's expressed desire to drive his wife home, the defendant agreed to Captain Hall's request to search his residence. The defendant and his wife returned home in their pickup truck, followed by a police cruiser and the defendant's other vehicle, driven by a police officer. A written consent to search form was signed by the defendant and witnessed by his wife in the drive-

way outside the defendant's residence. At the completion of the search, the police officers left the defendant and his wife at home.

At approximately 3:30 p.m. on the afternoon following the child's death, the defendant, his wife and a minister appeared in the front lobby of the Rochester police station. Officer McGee testified that he brought the defendant into his office and advised the defendant of his *Miranda* rights, and that the defendant subsequently waived those rights. The defendant repeated that his wife had beaten the child with straps and that he had observed the child's black eyes and the large cut on the back of her head. The defendant also informed Officer McGee that the beatings had gone on for "quite some time." Officer McGee characterized the defendant's behavior during the course of the interview as "calm," "rational," "responsive" and "cooperative." The defendant's oral statements were memorialized in a written form, which included a waiver of *Miranda* rights and was signed by the defendant.

After the interview, Captain Hall drove the defendant in a police cruiser to the defendant's residence to execute a second consent search. While proceeding towards the residence, Captain Hall told the defendant that "it was a crying shame that a young child like Amy was beaten so badly and that I felt he was as guilty as Sheila for not reporting it." Captain Hall further testified that the defendant replied that "he was scared, that he was thinking of turning his wife in, that he was thinking of leaving Sheila, and he also mentioned that she needed help." This statement by the defendant was neither covered by the defendant's motion to suppress nor objected to at trial.

The Trial Court (*Temple*, J.) denied the defendant's motion to suppress the statements made at the hospital and at the police station. After a hearing, the trial court found that the defendant did not undergo a custodial interrogation at either location. The trial court further found, beyond a reasonable doubt, that the defendant voluntarily and knowingly waived his federal constitutional rights. The defendant's motion for a bill of particulars was earlier denied. Also, the defendant's motion to set aside the jury verdict was denied.

We turn to the first issue raised by the defendant: whether the trial court erred in denying the defendant's motion for a bill of particulars. The defendant alleges that the information in this case was so vague that it precluded him from preparing a proper defense, in violation of part I, article 15 of the New Hampshire Constitution and of the Sixth Amendment of the United States Constitution. The information states that the defendant:

> "did knowingly endanger the welfare of Amy Portigue,
> the daughter of Rodney Portigue and a child under the

age of eighteen (18) years, by purposely violating a duty of protection which he, the child's father, owed to Amy Portigue in that he permitted Sheila Portigue to engage in conduct which caused bodily injury to Amy Portigue: to wit, Sheila Portigue did intentionally beat Amy Portigue about the head, neck, and body during the period of March, 1981, to January 9, 1982, and thereby caused Amy Portigue's death."

Also, the defendant challenges the validity of the information on two other grounds: first, the defendant asserts that the information, by charging culpable conduct by the defendant "during the period of March, 1981, to January 9, 1982 . . . ," enabled the State to introduce evidence of other alleged prior bad acts by the defendant which impermissibly prejudiced the jury; and second, the defendant argues that the State's evidence at trial did not demonstrate culpable conduct by the defendant prior to the summer of 1981.

We have long held that a constitutionally sufficient indictment informs the defendant of each element of the offense charged with sufficient specificity to enable the defendant to prepare his defense. *State v. Thresher*, 122 N.H. 63, 70, 442 A.2d 578, 581 (1982); *State v. Inselburg*, 114 N.H. 824, 827, 330 A.2d 457, 459 (1974). We conclude that the information in this case meets these requirements of specificity and fair notice. *State v. Sands*, 123 N.H. 570, 589, 467 A.2d 202, 213 (1983).

There is no evidence in the record before this court indicating that the defendant was in doubt regarding the offense for which he was charged. Further, the defendant failed to offer any proof that he was prevented from preparing a specific defense due to the alleged broadness of the information. In addition, in our review of the trial court record, we encountered no evidence of prior bad acts committed by the defendant which prejudiced the jury.

The information contains a full and fair description of the defendant's offense of endangering the welfare of his daughter, setting forth the necessary material elements constituting the offense. The offense proscribes the purposeful disregard by a parent of the duty of care, protection or support owed to his or her child. RSA 639:3 (Supp. 1983). The plain meaning of the statute suggests that it is not necessary for the State to charge specific incidents of parental disregard or specific beatings. Nor must the State allege a specific time frame in which the knowing endangerment took place in order to satisfy the material elements of the offense. *See* RSA 639:3 (Supp. 1983). An information which, as here, alleges a continuous course of

conduct involving continuous acts or omissions constituting endangerment is sufficient to give specific notice to a defendant so that he or she can prepare a proper defense.

The second issue raised by the defendant is whether his statements made at the hospital and at the Rochester police station were elicited by the police in contravention of the requirements of the Fifth and Fourteenth Amendments of the United States Constitution. The defendant's single cite to the New Hampshire Constitution in his motion to suppress was made without reference to a particular part, article or provision thereunder. *See State v. Miskolczi,* 123 N.H. 626, 628, 465 A.2d 919, 920 (1983). It is apparent from the record of the suppression hearing that the trial court considered only whether the defendant's federal constitutional rights were violated. *See id.* Further, the defendant did not assert any State constitutional claim, regarding his incriminating statements, in the notice of appeal, in the brief or at oral argument. Instead, the defendant in his appeal relating to this issue wholly failed to raise anything but a federal constitutional claim and propositions in State case law relying entirely on federal law. Accordingly, there is no reviewable State constitutional claim presented. *Cf. State v. Ball,* 124 N.H. 226, 231, 471 A.2d 347, 350 (1983).

The threshold inquiry in this Fifth and Fourteenth Amendment analysis is whether there was a custodial interrogation in this case. The police are required to give *Miranda* warnings only when a person is "in custody." *Oregon v. Mathiason,* 429 U.S. 492, 495 (1977). Custody for *Miranda* purposes has recently been defined by the United States Supreme Court as that restriction placed on the defendant which, based on the "totality of circumstances," constitutes a "'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler,* 103 S. Ct. 3517, 3520 (1983) (quoting *Oregon v. Mathiason supra.*)

In the present case, the interviews of the defendant in the hospital conducted both by Officer Cook and later by Captain Hall were noncustodial.

> "'Such a noncustodial situation is not converted to one in which *Miranda* applies simply because a reviewing court concludes that even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a "coercive environment" . . . . Any interview of one suspected of a crime by a police officer will have coercive aspects to it.'"

*California v. Beheler, supra* at 3519 (quoting *Oregon v. Mathiason supra*). In each interview, according to unrebutted police testimony, the defendant was free to leave at any time. The police did not attempt to isolate the defendant from his wife and family. The presence of uniformed police officers during the conduct of both interviews does not by itself satisfy the in-custody requirement. *California v. Beheler supra; Oregon v. Mathiason supra.* The record also reveals that the defendant had full access to several exits leading from the waiting room in the hospital emergency area either to other sections of the hospital or to the street outside.

Further, the defendant was never formally arrested. The facts showing that the defendant's daughter had died, and that his remaining children were being examined at the hospital, admittedly were inducements for the defendant to remain at the hospital, but were not conditions created by the police to subject the defendant to continued questioning.

The defendant's status as a suspect did not convert the interviews into custodial interrogations. *Miranda* warnings are not required simply "'because the questioned person is one whom the police suspect.'" *California v. Beheler, supra* at 3520 (quoting *Oregon v. Mathiason supra*).

The record further supports the trial court's finding that there was no custodial interrogation of the defendant at the Rochester police station. The record indicates that the defendant voluntarily appeared at the police station, and made his statement after the police informed him of his constitutional rights and at a time when he was free to leave. The defendant was not placed under arrest at the police station. Although the defendant was a suspect because he had spoken to the police earlier, the *Miranda* requirements are not imposed "'simply because the questioning takes place in the station house.'" *California v. Beheler supra* (quoting *Oregon v. Mathiason supra*).

Although the defendant was not in custody while at the hospital or at the police station to trigger the *Miranda* requirements, the standards of fundamental fairness under the due process clause of the United States Constitution do apply to noncustodial interrogations. *See Beckwith v. United States*, 425 U.S. 341, 347–48 (1976); *Schneckloth v. Bustamonte*, 412 U.S. 218, 223 (1973); *State v. Reynolds*, 124 N.H. 428, 432, 471 A.2d 1172, 1175 (1984). In *Beckwith*, the court recognized that "noncustodial interrogation might possibly in some situations, by virtue of some special circumstances, be characterized as one where 'the behavior of . . . law enforcement

officials was such as to overbear petitioner's will to resist and bring about confessions not freely self-determined.'" *Beckwith v. United States supra* (quoting *Rogers v. Richmond*, 365 U.S. 534, 544 (1961)). In reviewing noncustodial interrogation, it is our duty to "'examine the entire record and make an independent determination of the ultimate issue of voluntariness.'" *Id.* at 348 (quoting *Davis v. North Carolina*, 384 U.S. 737, 741–42 (1966)).

The defendant raised the voluntariness of his incriminating statements in his brief and at oral argument. Although the motion to suppress is ambiguous as to the voluntariness claim, the record of the suppression hearing indicates that the issue of voluntariness was raised and considered. We will therefore consider it here, while reminding counsel of the need for a record of issues raised. *See State v. Elbert*, 125 N.H. 1, 480 A.2d 854 (1984). In *Beckwith*, the court opined that when a voluntariness claim regarding incriminating statements made in a noncustodial setting is raised before an appellate court, the proper appellate inquiry should focus on the voluntariness of the statements under due process and not the voluntariness of any waiver of *Miranda* rights. *Beckwith v. United States supra*; *see also United States v. Beckwith*, 510 F.2d 741, 743 (D.C. Cir. 1975), *aff'd, Beckwith v. United States supra.*

The defendant argues that his incriminating statements to Officer Cook at the hospital were not voluntarily made and therefore should have been excluded. The defendant asserts that his statement to Officer Cook, "I don't want to get her in trouble," constituted a desire to terminate the interview and, in effect, to exercise his noncustodial Fifth Amendment rights, and thereby required Officer Cook to cease all questioning of the defendant. Officer Cook's subsequent threat of future prosecution, the defendant contends, was coercive and constitutionally tainted the voluntariness of his later statements.

To determine whether the use of the defendant's incriminating statements elicited by Officer Cook offends due process, our inquiry will focus on whether the defendant's statements were "'the product of an essentially free and unconstrained choice.'" *Schneckloth v. Bustamonte, supra* at 225 (quoting *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961)); *see also State v. Copeland*, 124 N.H. 90, 92, 467 A.2d 238, 240 (1983) (burden of State to prove that confession made during custodial interrogation was voluntary). We have indicated, relying on federal case law, that the test of voluntariness as to a confession is whether the statement was "'extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence.'"

*State v. Copeland supra* (quoting *Bram v. United States*, 168 U.S. 532, 542 43 (1897)).

 The question of whether a statement was in fact "voluntary" or was, rather, the product of duress or coercion must be determined from the totality of the surrounding circumstances, including the characteristics of the accused and the details of the interrogation. *See Beckwith v. United States*, 425 U.S. at 348; *Schneckloth v. Bustamonte*, 412 U.S. at 226; *State v. Reynolds*, 124 N.H. at 433–34, 471 A.2d at 1175. The factors to be considered in the present case include the defendant's asserted lack of sleep, his state of mind after the death of his child, Officer Cook's persistent questioning, and the officer's accompanying threat of future prosecution, in the face of the defendant's stated desire not to respond to Officer Cook's inquiries regarding the cause of the child's injuries, so as not to incriminate his wife. The fact that Officer Cook did not readvise the defendant of his constitutional rights after the "pause" in the interview is relevant to whether the interrogation was indeed coercive. *See Beckwith v. United States supra.* Each factor by itself, however, is not determinative of the voluntariness of the defendant's statements. *See Schneckloth v. Bustamonte, supra* at 227.

 The record indicates that the defendant was orally informed of his constitutional rights by Officer Cook prior to the start of the interview, despite the noncustodial setting. The defendant later signed a written waiver of his constitutional rights. Officer Cook testified that the defendant understood the statement of his constitutional rights, both when it was read to him and later when he signed it. "We do not suggest that compliance with *Miranda* conclusively establishes the voluntariness of a subsequent confession." *Berkemer v. McCarty*, 104 S. Ct. 3138, 3147 n.20 (1984). But it is a factor to be given consideration.

Officer Cook also testified that the defendant appeared "cool" and "calm" during the course of the interview. There was no testimony that the defendant was intoxicated or under the influence of drugs. In sum, the defendant is a man with a high school education who was seemingly rational throughout the interview, became aware of his constitutional rights prior to the interview and was capable of saying "no" to Officer Cook at any time during the interview.

Moreover, Officer Cook's admitted threat of future prosecution did not vitiate the defendant's consent, and also was constitutionally permissible under the due process clause. The record indicates that Officer Cook's statement, that if the defendant did not disclose the complete story surrounding the child's condition he "could probably be into some problems" with the Rochester police, did not overbear

the defendant's free will. *See United States v. Brandon*, 633 F.2d 773, 777 (9th Cir. 1980).

Further, it was quite proper, in view of federal case law, for Officer Cook in the course of the interview to succinctly describe the situation the defendant faced. *See id.* Officer Cook's threat of future prosecution does not rise to the constitutionally impermissible level, for instance, of federal agents threatening a mother that if she failed to cooperate she might not see her two-year-old child "for a while," *United States v. Tingle*, 658 F.2d 1332, 1336 (9th Cir. 1981), or of local detectives refusing to allow a suspect to call his wife until he confessed, *Haynes v. Washington*, 373 U.S. 503, 514 (1963).

■■■ We conclude that the defendant's statement to Officer Cook was induced neither by coercion nor by an unconstitutional threat of future prosecution.

The defendant also asserts that his incriminating statements elicited at the second interview in the hospital by Captain Hall were a product of a coercive atmosphere which violated due process. The record reveals that the defendant was brought into a small room in the emergency area by a police officer for questioning, in the face of the defendant's earlier statement to Officer Cook that "[a]fter talking with my wife I don't wish to speak with you." However, there is no evidence in the record that the police engaged in coercion to extract a statement from the defendant upon his entrance into the room. Captain Hall fully and fairly advised the defendant of his constitutional rights despite the noncustodial setting. The defendant waived his constitutional rights before making the statements. *See Berkemer v. McCarty supra.* In short, nothing the police officers or the county attorney present in the room were shown to have said or done was overbearing of the defendant's will.

■■■ Based upon our review of the entire record, we hold that the evidence supports the finding, beyond a reasonable doubt, that the defendant voluntarily made incriminating statements to the police during the course of the second interview at the hospital. *See State v. Reynolds*, 124 N.H. at 435, 471 A.2d at 1176.

We turn to the third issue raised by the defendant: whether the defendant's motions for mistrial were properly denied by the superior court. The first motion for mistrial relates to the emergency room nurse's testimony on direct examination as to whether the Portigue child had previously been treated at Frisbie Memorial Hospital:

> "Q: Was there an indication that she had been there before?
>
> A: No, not her."

The defense counsel timely objected to the admissibility of the testimony and his subsequent exception was noted.

The defendant asserts that the nurse's testimony created the clear inference that other Portigue children had been examined in the hospital. The defendant's interpretation of the nurse's testimony strains credibility. It is not at all apparent from the relevant testimony that the defendant's other children were brought into the hospital at any time. The statement "not her" could conceivably relate to other parents' children. Accordingly, the defendant's first motion for mistrial does not prompt an analysis of the allegedly prejudicial effect of the nurse's testimony. *See State v. Berger*, 125 N.H. 83, 480 A.2d 27 (1984).

The defendant's second motion for mistrial was brought in response to Lieutenant Winship's conduct at trial, when, in his advancement toward the witness stand, he "ceremoniously" dropped a large opaque plastic bag on the prosecution table, to the declared surprise of the prosecutor. Subsequently, the court declared a recess. The contents of the bag were neither exposed to the jury nor offered in evidence. *See State v. Scarlett*, 118 N.H. 904, 395 A.2d 1244 (1978).

The defendant argues that the obtrusive act of dropping a bag on a table in front of the jury, the admissibility of which had yet to be determined, deprived the defendant of a fair trial. Specifically, the defendant contends that in the collective minds of the jury the later unexplained disappearance of the bag created the reasonable inference that the defendant had succeeded in hiding damaging evidence. This inference, the defendant asserts, severely prejudiced the jury.

The parties agree that a "curative jury instruction" was given by the trial court in response to the display of the opaque plastic bag. The record indicates that such an instruction was not given after the recess. Accordingly, we presume that the trial court instructed the jury to disregard the plastic bag at the close of the evidence, during its charge to the jury. The trial court's charge was not forwarded to this court as part of the record. *See* SUP. CT. R. 15(3).

We agree with the trial court's ruling that the defendant's argument is based on the unfounded assumption that the jury would disregard the court's curative jury instructions. The jury is presumed to follow trial court curative instructions. *State v. Berger supra.*

Here, the exhibition of an opaque plastic bag of no apparent materiality, the contents of which were never exposed, does not rise

to the level of irreparable prejudice which precludes a fair trial. *See State v. Berger supra.*

We conclude that the trial court did not abuse its discretion in denying the second mistrial motion. *See State v. Glidden,* 123 N.H. 126, 136, 459 A.2d 1136, 1142 (1983).

Finally, the defendant asserts that the evidence was insufficient to support the conviction. We will view the evidence in the light most favorable to the prosecution, *State v. Sliz,* 124 N.H. 389, 391, 469 A.2d 1357, 1359 (1983), and determine whether any rational trier of fact could have found proof of the elements of the crime beyond a reasonable doubt. *Id.*

Testimony at trial established that the defendant was aware of the beatings inflicted on the child by his wife and, indeed, observed some of the beatings. The child's injuries, enumerated in detail herein, were numerous in extent and obvious in degree. We are left with the inescapable conclusion that the defendant must inevitably have discovered the injuries.

The record reveals that the defendant understood the egregious circumstances under which his child lived: assorted witnesses testified that the defendant stated that he should have taken the child away from his wife, that he considered leaving his wife and reporting the beatings to the authorities. In fact, the defendant conceded that he did not report the beatings because he did not want his wife to go to jail.

We hold that the testimony at trial, viewed in the light most favorable to the prosecution, would support the verdict, and that a rational jury could have found proof beyond a reasonable doubt that the defendant, as charged, purposefully breached the duty of care owed to his child.

*Affirmed.*

All concurred.