Rockingham
No. 83-358
Hillsborough
No. 83-481

### THE STATE OF NEW HAMPSHIRE

v.

### STEVEN P. WONG

### THE STATE OF NEW HAMPSHIRE

v.

### JOEL GRINDLE

October 26, 1984

*Gregory H. Smith*, attorney general (*Robert B. Muh*, attorney, on the brief in *Wong*; *Brian T. Tucker*, assistant attorney general, on the brief in *Grindle*; and *Michael A. Pignatelli*, assistant attorney general, orally in both cases), for the State.

*Jeffco, May & Smart*, of Portsmouth (*Dennis M. May* on the brief and orally), for the defendant Steven P. Wong.

*Holland & Aivalikles*, of Nashua (*Francis G. Holland* on the brief and orally), for the defendant Joel Grindle.

PER CURIAM. The central question posed by these consolidated appeals is whether the State must allege and prove the elements of criminal negligence as defined by the Criminal Code, RSA 626:2, II(d), to sustain a conviction under section II of the negligent homicide statute, RSA 630:3. We hold that the culpability requirement of negligent homicide is satisfied upon proof of the fault element of section II: that a person operated a propelled vehicle while under the influence of intoxicating liquor or a controlled drug. RSA 630:3, II. We note that the State must establish a causal connection between the culpability prescribed by section II and the resulting death to meet the requirements of section II. We also examine the defendant Joel Grindle's argument that section II is constitutionally defective as violative of the due process and equal protection guarantees of the State and Federal Constitutions, and we decide that the section is constitutional.

Three subsidiary matters are also presented: (1) the sufficiency of the evidence to support the jury verdict in *Grindle*; (2) the admissibility of the results of a breathalyzer test in *Grindle* obtained by police approximately one and one-half hours after the collision, without preserving a second blood sample for the use of the defendant, and of the results of a warrantless blood alcohol test in *Wong*; and (3) the validity of specific trial court evidentiary rulings in *Grindle*. For the reasons that follow, we affirm the convictions in both *Wong* and *Grindle*.

The defendant Grindle was convicted by a jury in the Hillsborough County Superior Court (*Dalianis*, J.) of negligent homicide in violation of RSA 630:3, II.

The defendant Steven P. Wong was convicted by a jury in the Rockingham County Superior Court (*Bean*, J.) of negligent homicide in violation of RSA 630:3.

For the purpose of determining the sufficiency of the evidence in *Grindle*, the following facts have been adduced from the trial record. On May 15, 1982, shortly before 10:00 p.m., an automobile driven by the defendant collided with a bicycle ridden by the victim, Randy Benoit. The defendant testified that he was en route home from a party when the collision occurred. The defendant was present at the party from about 4:00 p.m. until 9:30 p.m., during which time he consumed approximately six beers along with assorted items of food. Several witnesses who attended the party testified that they did not observe anything "unusual" or "wrong" about the defendant during the course of the party.

As he was driving home the defendant noticed "something" in the road, at which point the car windshield shattered. He said that he did not see the victim before the impact. The defendant also testified

that he did not have a chance to use the brakes before his automobile struck the victim. He characterized the road where the collision occurred as "dark" and without street lights.

After the windshield shattered, the defendant slowed the automobile to a stop. Upon discovering that his car had struck a bicyclist, the defendant attempted to call an ambulance from a nearby building which proved closed. Subsequently, the defendant returned to the victim, discovered the victim's difficulty breathing, and then drove to the Milford police station to report that he had "just hit somebody" and that the person was "hurt bad."

Patrolman Sturges, one of the police officers who met the defendant in the lobby of the police station immediately upon the defendant's arrival, testified that the defendant's eyes were bloodshot and watery, and that his breath smelled from a "strong odor" of an alcoholic beverage.

The police arriving at the accident scene found the victim alive but unconscious in a ditch approximately ten feet from the roadway. The victim later died as a result of the injuries sustained from the collision.

Then-acting Chief of Police Rasmussen testified that while talking to the defendant at the police station, he detected an odor of alcoholic beverages emanating from the defendant's breath, and discerned that the defendant's eyes were watery, his face flushed and his speech slurred. Upon Officer Rasmussen's statement of the New Hampshire implied consent law, the defendant consented to three field sobriety tests: finger-to-nose, key-pick-up, and balancing, which were administered within fifteen to twenty minutes after the defendant's arrival at the police station. Officer Rasmussen testified that the defendant was "unsteady" and swayed throughout his performance of the tests.

Following the field sobriety tests, the defendant was placed under arrest for driving under the influence of alcohol and given a breathalyzer test which he failed: at 11:29 p.m., approximately an hour and a half after the accident, the breathalyzer revealed the defendant's .16 percent blood alcohol content. Patrolman Deneault, the breathalyzer operator, observed the defendant for a twenty-minute period prior to administering the test. The patrolman testified that the defendant, during this observation period, "appeared to be intoxicated" and described the defendant's eyes as bloodshot and watery, and his breath as smelling of alcohol. The police officer who took the defendant's fingerprints also testified that there was a "moderate to heavy odor" of alcohol on the defendant's breath, that the defendant was "waving back and forth" and that his eyes were "watery and glassy."

The defendant's expert witness in traffic accident reconstruction, John H. Meserve, testified that in his opinion "it would have been difficult, if not impossible, for a driver to observe an object" in the area of the fatal collision at the approximate time of the accident until the driver was "about on top of the object."

There was testimony that approximately ten to fifteen minutes prior to the collision, four police cruisers drove past the bicyclist as he was bicycling in the approximate area on the road where the fatal accident occurred. Three officers stated that they experienced no difficulty in seeing the bicyclist, who was said to be riding with the traffic in the breakdown lane of the road, as they slowed their vehicles and drove around him. The reflectors on his bicycle were also visible to one of the officers.

Senior Patrol Supervisor Douglas, one of the police officers who drove past the bicyclist, testified that the accident scene was visible for approximately one-tenth of a mile. The road is straight over that area and the posted speed limit is thirty-five miles an hour. Officer Douglas also testified that the closest street light to the point of impact was located approximately 350 to 400 feet across the road at the nearby pumping station.

Officer Douglas also testified that in his opinion a "scuff mark" discovered on the road at the scene of the collision indicated that the point of impact was a short distance into the travel lane, and also revealed that the right front tire of the defendant's automobile was either on the white line of the breakdown lane or just to the breakdown side of it.

The Trial Court (*Dalianis*, J.) denied the defendant's motions to suppress the results of the breathalyzer test. The defendant also moved to exclude any items seized or taken from his automobile following the collision. After a pretrial hearing, the trial court granted the defendant's motion to suppress evidence gathered from the automobile's interior. However, at trial, the trial court permitted the State to introduce photographs and measurements of the exterior of the defendant's automobile. At the close of the State's case, the defendant moved for a directed verdict, which was denied by the trial court.

The defendant Wong was the driver of an automobile which at approximately 11:24 p.m. on June 16, 1982, collided with a motorcycle, resulting in the death of the motorcyclist, Damon Lee Spencer. Within several minutes of the fatal collision, Sergeant Gilmore of the Exeter Police Department arrived at the scene, determined the identity of the defendant, and, upon learning from another police officer that the defendant's breath smelled of alcohol, administered field sobriety tests. As a result of these tests, Sergeant Gilmore con-

cluded that the defendant was under the influence of intoxicating liquor, and, accordingly, arrested him for driving while intoxicated.

At the Exeter police station, after the defendant was informed of the New Hampshire implied consent law, he declined to submit to a breath or a blood test. Subsequently, at about 11:59 p.m., the defendant was charged with negligent homicide.

Lieutenant Smith of the Exeter police informed the defendant that due to the death of the motorcyclist and the negligent homicide charge, it "was no longer his choice" whether to submit to a blood alcohol test. Officer Smith inquired whether the defendant would prefer a blood or a breath test, and the defendant chose a blood test. At approximately 12:17 a.m., on June 17, 1982, a blood specimen was extracted from the defendant at Exeter hospital. The blood analysis revealed the defendant's .21 percent blood alcohol content.

The Trial Court (*Bean*, J.), after a hearing, denied the defendant's motion to suppress the results of the blood alcohol test. A subsequent motion to reconsider and set aside the order was denied by the trial court after another hearing prior to trial. The defendant also moved to quash the indictment against him, and the trial court denied the motion after a hearing.

*Grindle* and *Wong* were consolidated on appeal.

I. *Negligent Homicide*

RSA 630:3—the negligent homicide statute—provides that "[a] person is guilty of a class B felony when he causes the death of another:

> I. Negligently; *or*
>
> II. In consequence of his being under the influence of intoxicating liquor or controlled drug while operating a propelled vehicle, as defined in RSA 637:9, III . . . ."

(Emphasis added.)

To construe the meaning of RSA 630:3, we must determine the intent of the legislature in enacting the statute by reference to the language of the statute itself. *See In re Robyn W.*, 124 N.H. 377, 379, 469 A.2d 1351, 1352 (1983). We will ascribe to the crucial words of the statute their plain and ordinary meaning. *Id.; see* RSA 21:2.

The legislature's use of the disjunctive "or" in the body of the negligent homicide statute to distinguish section I and section II of the statute, RSA 630:3, evinces a clear intent to require proof of *either* section I or section II of the statute in order to sustain a conviction of negligent homicide. *See Boyce v. Concord Gen. Mut. Ins. Co.*, 121 N.H. 774, 777, 435 A.2d 510, 512 (1981). That is, the literal meaning of the word "or" in the statute indicates that sections I and

II should be treated as alternative methods to prove the culpability requirement of negligent homicide.

The plain meaning of RSA 630:3 comports with the comments of the drafters of the statute. The statute is based, in part, on the "determination" by the drafters that "using an instrumentality as dangerous to human life as a vehicle . . . while in a state of intoxication is *per se* negligence." REPORT OF COMMISSION TO RECOMMEND CODIFICATION OF CRIMINAL LAWS, Comments, at 36 (1969). This determination by the drafters of the negligent homicide statute that driving while intoxicated is negligence *per se* is consistent with the declared policy of the legislature that:

> "intoxicated drivers are a severe threat to the health and safety of the citizens of New Hampshire and visitors from out-of-state who use our highways. According to a 1979 report by the New Hampshire department of safety, approximately 1/2 of the 184 persons who died on New Hampshire highways in 1979 were killed by intoxicated drivers. The general court declares that driving while intoxicated is a deplorable act which shows wanton disregard for the rights of others to safely use our highways."

Laws 1981, 543:5; *cf. Cannon v. State*, 91 Fla. 214, 218, 107 So. 360, 362 (1926).

■ Accordingly, it is clear that the legislature, in adopting the drafters' formulation of the negligent homicide statute, intended that the culpability requirement of negligent homicide can be satisfied *either* by showing that a person caused the death of another "[n]egligently," RSA 630:3, I, as defined by RSA 626:2, II(d), *or* by establishing that the person caused the death in consequence of driving a propelled vehicle while under the influence of intoxicating liquor or a controlled drug, RSA 630:3, II.

Our construction of RSA 630:3, II, does not controvert the general requirement of the Criminal Code that a proscribed felony must specify a culpable mental state recognized by the Code. RSA 626:2, I; *see also State v. Aldrich*, 124 N.H. 43, 47, 466 A.2d 938, 940 (1983).

Moreover, the argument that the State must prove *both* driving while under the influence of intoxicating liquor *and* criminal negligence as defined by the Criminal Code, to sustain a conviction under section II of the negligent homicide statute, would render section II superfluous. Under this proposed construction, if the elements of criminal negligence can be satisfied, the State would prosecute only under section I and not under section II. Certainly, the legislature intended that section I and section II should each have some inde-

pendent purpose and effect, and we will construe the statute in that light. *See Kalloch v. Board of Trustees*, 116 N.H. 443, 445, 362 A.2d 201, 203 (1976).

■ It is also apparent from our analysis of the negligent homicide statute that because a person who is proven to have driven an automobile while intoxicated is criminally negligent *per se*, that person may not in turn defend the negligent homicide charge by demonstrating due care or the State's failure to prove an element of criminal negligence under RSA 626:2, II(d).

■ We do not, however, construe section II of the negligent homicide statute so as to dispense with the requirement that the culpability prescribed by section II must be the cause of the death. Therefore, to sustain a conviction under section II, the State must establish a causal connection between the person's driving under the influence, the subsequent collision and the resulting death.

A. *Grindle*

The defendant alleges that the jury instructions were incorrect as a matter of law. *See State v. Bird*, 122 N.H. 10, 15, 440 A.2d 441, 443 (1982).

The Trial Court (*Dalianis*, J.) instructed the jury that:

> "A person would be guilty of this offense—that is, negligent homicide—if, in consequence of his being under the influence of intoxicating liquor, he causes the death of another while he's operating a motor vehicle . . . . You must find that at the time and place of the accident Mr. Grindle was under the influence of intoxicating liquor and that, as a consequence of his being so, he caused the death of Randy Benoit."

■ The defendant first challenges the trial court's failure to instruct the jury that proof of the elements of criminal negligence as defined in RSA 626:2, II(d), in addition to a showing that the defendant drove while under the influence of intoxicating liquor, is necessary to support a conviction under section II of the negligent homicide statute.

As shown in our prior discussion, proof of section II constitutes proof of negligence *per se* and, as such, satisfies the express *mens rea* requirement of the Criminal Code. Thus, to require the State to prove that the defendant acted both "negligently" and that he operated his automobile while under the influence of intoxicating liquor would be a needless redundancy under the negligent homicide statute.

■ The defendant also argues that the trial court erred in failing to instruct the jury of the requirement of a causal connection between the defendant's driving while under the influence of intoxicating liquor and the resulting death. It is clear from the record that the trial court properly instructed the jury on the issue of causation. The trial court, as it must under our construction of the negligent homicide statute, explicitly required proof that "as a consequence" of the defendant's being under the influence of intoxicating liquor at the time of the collision, he caused the victim's death.

Accordingly, we conclude that the trial court's jury instruction on the material elements of the negligent homicide charge is in complete accordance with our construction of section II of the negligent homicide statute. *See State v. Bird supra.*

We turn to the defendant's constitutional challenge to section II of the negligent homicide statute for its asserted lack of an express culpable mental state. The transcript reveals that the defendant's exception to the trial court's jury instruction was expressly premised on the defendant's position that the trial court misconstrued RSA 630:3, II as prescribing a strict liability offense. We have already disposed of the defendant's misinterpretation of the negligent homicide statute, deciding that proof of driving while under the influence of intoxicating liquor, and thereby causing death, supplies the necessary culpability requirement of negligent homicide. We will, however, reach those constitutional issues raised by the defendant on appeal which are essential to a determination of the facial validity of section II as we have construed it.

The defendant argues that RSA 630:3, II is unconstitutionally vague and overbroad in violation of part I, article 15 of the New Hampshire Constitution and of the fifth and fourteenth amendments of the United States Constitution. We disagree.

■■ A criminal statute is void for vagueness when it "'forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application.'" *State v. Chaisson,* 123 N.H. 17, 26, 458 A.2d 95, 100 (1983) (quoting *State v. Albers,* 113 N.H. 132, 133, 303 A.2d 197, 199 (1973)) (citation omitted). The language of section II gives clear notice to a person of ordinary intelligence that the act of driving an automobile while under the influence of intoxicating liquor, with death resulting as a consequence of the act, is proscribed by the Criminal Code. *See State v. Albers, supra* at 133–34, 303 A.2d at 199. Section II does not require persons of ordinary intelligence to guess either about its meaning or about its application.

Nor is section II void for overbreadth. A statute is unconstitutionally overbroad when it sweeps "unnecessarily broadly and thereby invade[s] the area of a protected freedom." *State v. Chaisson, supra* at 27, 458 A.2d at 100. In prohibiting a person from causing death as a consequence of driving an automobile while under the influence of intoxicating liquor, section II does not infringe a protected freedom.

The defendant also asserts that section II of the negligent homicide statute violates the equal protection guarantees of the State and Federal Constitutions. The defendant argues that section II creates a constitutionally impermissible classification which treats criminal defendants–indicted for negligent homicide under section II differently from similar defendants charged with negligent homicide under section I of the statute. *See Belkner v. Preston,* 115 N.H. 15, 17, 332 A.2d 168, 170 (1975). However, in view of our analysis of the culpability supplied by section II, we are unable to conclude that a class of defendants indicted under section II, for driving under the influence of intoxicating liquor and thereby causing death, are treated dissimilarly from those defendants charged with negligently causing death under section I of the statute.

Finally, the legislature's determination that proof of the elements of section II of the negligent homicide statute constitutes proof of criminal negligence *per se* does not implicate the due process guarantees contained in part I, article 15 of the State Constitution. The legislature has the constitutionally recognized authority to define criminal acts and to prescribe punishments, *Doe v. State,* 114 N.H. 714, 718, 328 A.2d 784, 787 (1974); N.H. CONST. pt. II, art. 5, which conform to constitutional limits, *State v. Farrow,* 118 N.H. 296, 305, 386 A.2d 808, 814 (1978). Consistent with this authority, the legislature may declare an act criminally negligent *per se. Cf. McIntire v. Borofsky,* 95 N.H. 174, 176, 59 A.2d 471, 473 (1948); *Coutremarsh v. Metcalf,* 87 N.H. 127, 130, 175 A. 173, 175 (1934). Certainly, there is ample support for the legislature's determination that driving while under the influence of intoxicating liquor is criminal negligence *per se. See* Laws 1981, 543:5.

The defendant failed to challenge the sufficiency of the indictment in the court below.

## B. *Wong*

The defendant attacks the validity of the indictment on the ground that it alleges two separate criminal acts in the alternative, in contravention of the necessary certainty required of indictments by part I, article 15 of the New Hampshire Constitution and by the

sixth amendment of the United States Constitution. *See State v. Rodney Portigue*, 125 N.H. 352, 481 A.2d 534 (1984). The indictment charges, in pertinent part, that the defendant:

"did commit the crime of negligent homicide in that, as a consequence of his being under the influence of intoxicating liquor while operating a 1980 Chevrolet Citation automobile, he negligently caused the death of Damon Lee Spencer . . . ."

The defendant argues that the indictment by duplicitously alleging two criminal acts—death as a consequence of driving under the influence of alcohol, and negligently caused death—permitted the jury to return a verdict on either one of two separate and distinct theories of criminal culpability: death caused by driving while under the influence of intoxicating liquor, RSA 630:3, II, and death caused by criminal negligence, RSA 630:3, I; RSA 626:2, II(d).

While the indictment at issue is redundant, it is not duplicitous. *See State v. Bussiere*, 118 N.H. 659, 661, 392 A.2d 151, 153 (1978). The indictment alleges a single act and advances only one theory of culpability: criminal negligence as proven by driving while intoxicated thereby causing death. The insertion of the adverb "negligently" in the indictment is harmless surplusage which does not invalidate the constitutionality of the indictment. *See State v. Lurvey*, 122 N.H. 190, 192–93, 442 A.2d 592, 593–94 (1982) (allegations in an indictment in excess of statutory offense may be treated as superfluous, and do not necessarily control State's burden of proof).

It should be noted that in those circumstances in which the State proceeds on *two* different *indictments* separately charging negligent homicide based, respectively, on section I or section II of the statute, and the trial court instructs on both charges, proof of either charge would satisfy the culpability requirement of negligent homicide. However, we do not, of course, concede that section I and section II of the statute describe two different states of mind or two different levels of culpability.

The defendant did not raise the validity of the trial court's jury instructions on appeal.

II. *Sufficiency of the Evidence—Grindle*

The defendant argues that the State failed to establish a causal connection between his alleged driving under the influence of intoxicating liquor and the death of the victim. He asserts that no driver, including himself, could have avoided the bicyclist that particular

evening, even if the bicycle was somehow visible at the immediate moment prior to the collision.

▮▮▮▮▮▮ We will view the evidence in the light most favorable to the State, *State v. Rodney Portigue supra*, and determine whether any rational trier of fact could have found proof of the offense beyond a reasonable doubt. *Id.* Circumstantial evidence deemed sufficient to support a conviction must exclude all rational conclusions but that the defendant was guilty. *State v. Meloon*, 124 N.H. 257, 259, 469 A.2d 1316, 1318 (1983). When circumstantial evidence is susceptible to more than one reasonable interpretation, as here, it is the province of the jury to decide whether the evidence as a whole supports the material elements of the crime beyond a reasonable doubt. *See State v. Hamel*, 123 N.H. 670, 678–79, 466 A.2d 555, 560 (1983).

The State produced testimony from four police officers that the defendant exhibited the characteristics commonly associated with being under the influence of intoxicating liquor: the "strong odor" of alcohol permeated the defendant's breath, his speech was slurred, his balance was unsteady, and his eyes were bloodshot and watery. The defendant also unsatisfactorily performed three field sobriety tests. Further, approximately one and one-half hours after the fatal collision, the defendant registered a .16 percent blood alcohol content level on the breathalyzer test. The record reveals no evidence that the defendant consumed alcoholic beverages after the collision or prior to the breathalyzer examination. Therefore, these pieces of evidence, viewed together, create the reasonable inference that the defendant was under the influence of intoxicating liquor at the time of the collision. *See State v. Rullo*, 120 N.H. 149, 153, 412 A.2d 1009, 1012 (1980).

We turn to the question whether the victim's death was caused in consequence of the defendant's driving while under the influence of intoxicating liquor. The jury conducted a "view" of the scene of the collision. After viewing the place of impact, the jury was presented evidence that four police cruisers had safely passed the victim, minutes before the collision, as the victim bicycled on the identical road where the collision occurred, along with testimony concerning the location of footprints and bicycle tracks in the sanded area next to the roadway indicating that the victim had stopped his bicycle near the point of impact. Other evidence indicated that the victim was thrown 167 feet from the point of impact to the ditch where his body was discovered.

In addition, the jury heard considerable other evidence relative to causation, including: (1) the testimony of Officer Douglas that a

scuff mark at the point of impact indicated that the bicycle was on the edge of the travel lane, and the right front tire of the defendant's automobile was either on the white line of the breakdown lane or just to the breakdown side of it; (2) the testimony of the defendant's expert witness, Mr. Meserve, that "it would have been difficult, if not impossible" for a driver in the particular area of collision, and at the general time of the collision, to see an object until the driver was about on top of the object, and that the so-called "sight distance" from a hill south of the scene to the collision area itself, as the defendant traveled north, was only fifteen or twenty seconds; and (3) the further testimony of Officer Douglas that the visibility near the point of impact, minutes prior to the collision, extended approximately one-tenth of a mile, that the nearest street light was about 350 to 400 feet away from the scene, and that the road in the area of the collision was straight and the speed limit thirty-five miles per hour.

We note that the jury could have disbelieved any part of the expert testimony presented by either the defendant or the State. *See Roy v. Perrin*, 122 N.H. 88, 95, 441 A.2d 1151, 1155 (1982). We are, of course, bound by the established principle that conflicting testimony is for the jury to resolve. *State v. Berry*, 117 N.H. 352, 355, 373 A.2d 355, 357 (1977). We are unable to conclude, as a matter of law, that no reasonable trier of fact, upon viewing the scene of the collision and considering the identical evidence as a whole, could find beyond a reasonable doubt that the defendant caused the victim's death while operating a motor vehicle under the influence of intoxicating liquor.

The defendant's argument that proof that the death occurred on a "public way" is a necessary material element of section II of the negligent homicide statute, RSA 630:3, II, is without support. Neither section II nor the statutory language which defines a propelled vehicle, RSA 637:9, III, makes mention of a public way requirement.

III. *Admissibility of Blood Alcohol Test Results*

A. *Grindle*

The defendant argues that the trial court erred in denying his motions to suppress the results of the breathalyzer test performed approximately one and one-half hours after the collision. First, the defendant asserts that the blood alcohol results are inadmissible as a matter of law because the State failed to establish by competent evidence the defendant's blood alcohol level at the precise time of the accident.

We have long recognized that any delay between the occurrence of an event and the examination of blood alcohol content goes to the weight of the evidence and not to its admissibility. *State v. Gallant,* 108 N.H. 72, 74, 227 A.2d 597, 598 (1967). Here, there was no evidence that the defendant consumed alcohol between the time of the collision and the test. Moreover, as this court observed in *State v. Gallant,* in general the delay in recording a blood alcohol analysis "works in favor of the accused, although there may be extraordinary circumstances where the alcoholic content in the defendant's blood would be lower at the time of the arrest than when the blood sample was taken." *Id.*

The defendant's challenge to the validity of the trial court's jury instruction on the State's burden of proof with respect to the defendant's blood alcohol content at the time of the collision was not raised below and will not be addressed on appeal. *See State v. Laliberte,* 124 N.H. 621, 474 A.2d 1025 (1984).

 Second, the defendant contends that the State's failure to preserve an additional sample of his breath for independent analysis violated the due process and equal protection guarantees of the State and Federal Constitutions. The due process and equal protection guarantees of the State Constitution did not mandate that this defendant be provided an additional breath sample to allow for independent testing by an expert of his own choice. *State v. Cornelius,* 122 N.H. 925, 452 A.2d 464 (1982); *State v. Shutt,* 116 N.H. 495, 363 A.2d 406 (1976); *see also California v. Trombetta,* 104 S. Ct. (1984) (the failure by State law enforcement agencies to preserve breath samples for the use of criminal defendants does not violate the due process clause of the fourteenth amendment of the United States Constitution). The defendant has failed to distinguish the situation at hand from the case law on point.

Third, the defendant argues that the State failed to satisfy the statutory standards for introduction of the breath test. Specifically, the defendant asserts that the test was improperly administered, but fails to specify the alleged deficiency in the administration of the test. There was no objection at trial to the operator's knowledge of breathalyzer procedures or his experience in conducting breath tests. At the suppression hearing, the defendant's challenge to the admission of the test results did not identify a specific defect in the administration of the test.

██ ██ The question of whether an intoxication test is operated properly is for the trial court to determine on the basis of the evidence before it. *State v. Roberts,* 102 N.H. 414, 417, 158 A.2d 458, 460 (1960). Here, the trial court properly ruled that any deficiencies

in the administration of the test, assumed by the trial court for the sake of argument, affected the weight and not the admissibility of the test results. *See State v. Lafountain*, 108 N.H. 219, 222, 231 A.2d 635, 638 (1967).

The defendant also contends that there is no evidence that he was provided with a copy of the breath test results as required by RSA 265:84 (Supp. 1983). The defendant failed to raise this issue either in his written motions to suppress or at the suppression hearing, and the trial court did not consider it. Accordingly, we will not address the question on appeal. *See State v. Laliberte supra.*

Lastly, the defendant argues that the State failed to establish that it afforded him the opportunity to request an additional blood alcohol test as required by RSA 265:87, I(b).

The transcript of the suppression hearing indicates, as the defendant concedes, that the defendant was told by then-acting Chief of Police Rasmussen of his right to have a similar breath test made by a person of his own choosing and at his own expense. Rasmussen further testified that the defendant did not exercise this option to have an additional test performed. There is no evidence in the record before us that the defendant was prevented from requesting a second test or that he was in any way interfered with in exercising this statutory right. *See State v. Dunsmore*, 112 N.H. 382, 384, 297 A.2d 230, 231 (1972).

The opportunity to request the additional test, as a matter of law, was afforded the defendant at the time he was informed of his right to the test. *Id.*

## B. *Wong*

The defendant argues that the trial court erred in denying his motion to suppress the results of the blood alcohol test obtained without his consent. The question whether the results of a blood alcohol test taken without a defendant's consent may be introduced as evidence of intoxication in a case in which the State seeks to secure a felony conviction was first answered in *State v. Berry*, 121 N.H. 324, 327, 428 A.2d 1250, 1251 (1981). In that case, we construed our implied consent law, RSA 262-A:69-a to -m (Supp. 1979) (current version at RSA 265:84 to :92 (Supp. 1983)), and held that the legislature, in RSA 262-A:69-e (Supp. 1979) (current version at 265:92 (Supp. 1983)), prohibited such test results from admission into evidence. *State v. Berry, supra* at 328, 428 A.2d at 1252.

In 1981, however, the legislature spoke on the issue, when it amended RSA 262-A:69-e (Supp. 1979). Laws 1981, 563:4. The purpose of the amendment was "to eliminate the prohibition against the

taking of a chemical test to determine intoxication where a person is under arrest for any offense *other than a violation or misdemeanor* under RSA 262-A." Laws 1981, 563:3 (emphasis added). The legislature further stated that under the amendment, "[a] chemical test to determine intoxication as provided under RSA 262-A:69-a *may be given* to any person under arrest for any offense other than a violation or misdemeanor under RSA 262-A even if that person refuses such a test, provided the test does not violate constitutional requirements." *Id.* (emphasis added). This brings us to the question presented in the case before us.

The defendant argues that the blood alcohol results should have been excluded from evidence as the product of an unlawful search and seizure in violation of the fourth and fourteenth amendments of the United States Constitution. The defendant failed to assert any State constitutional claim. *See State v. Miskolczi*, 123 N.H. 626, 628, 465 A.2d 919, 920 (1983).

 "The warrantless taking of blood from a person under arrest without his consent is undoubtedly constitutional [under the Federal Constitution], and many cases have so held." *State v. Berry*, 121 N.H. 324, 327, 428 A.2d 1250, 1251 (1981). The threshold question here is whether probable cause plus exigent or emergency circumstances existed which justified the State's warrantless search. *See Schmerber v. California*, 384 U.S. 757, 769–70 (1966); *State v. Thorp*, 116 N.H. 303, 306, 358 A.2d 655, 658 (1976). The State must prove by a preponderance of the evidence that the circumstances of the search made it necessary for the police to proceed without a warrant. *State v. Dearborn*, 114 N.H. 457, 460, 322 A.2d 924, 926 (1974).

There is no question that Lieutenant Smith had probable cause to believe that the defendant had driven while under the influence of intoxicating liquor, resulting in a fatality. *See State v. Thorp, supra* at 306–07, 358 A.2d at 658–59. There was testimony at the suppression hearing that Lieutenant Smith was informed shortly after 11:30 p.m. that there had been a fatal automobile collision. After Lieutenant Smith's arrival at the Exeter police station at approximately 11:50 p.m., he became aware that the defendant was the driver of the automobile involved in the collision, that an Exeter police officer had witnessed the collision, that the defendant had failed field sobriety tests administered at the scene, that the defendant had been arrested by an Exeter police officer for driving while under the influence of intoxicating liquor, and that the defendant had refused to take a breath or a blood test. Within five minutes of Officer Smith's arrival at the police station, he observed the defendant and

concluded that the defendant displayed the characteristics associated with being under the influence of intoxicating liquor.

■ The defendant contends that exigent circumstances did not exist to justify the warrantless search. A State law enforcement agent is confronted with an emergency which will permit the taking of a blood sample, without a search warrant, when he or she *reasonably believes* that "the delay necessary to obtain a warrant, under the circumstances, threaten[s] 'the destruction of evidence.'" *Schmerber v. California, supra* at 770 (quoting *Preston v. United States,* 376 U.S. 364, 367 (1964)); *cf. State v. Theodosopoulos,* 119 N.H. 573, 580, 409 A.2d 1134, 1139 (1979) (under *State* constitutional law, whether the exigencies of a situation permit a warrantless search depends on the "totality of the circumstances").

■ The purpose of the blood test in this case was to obtain an accurate indication of the defendant's condition at the time of the collision. We have taken judicial notice of the fact that alcohol is metabolized or chemically changed by blood so as to render blood alcohol content diminished or undetectable with the passage of time. *State v. Schneider,* 124 N.H. 242, 245, 470 A.2d 887, 889 (1983). Accordingly, because of this characteristic of alcohol in blood, any significant delay in taking a blood sample may deprive the State of reliable evidence of a defendant's condition at the time he or she drove an automobile. *See Harlan v. State,* 113 N.H. 194, 197, 308 A.2d 856, 858 (1973).

The evidence supports a finding that Lieutenant Smith reasonably believed that the delay necessary to seek out a judge late at night to secure a search warrant, particularly where time had to be taken both to further investigate the collision and to bring the defendant to the Exeter hospital for the blood test, threatened the accuracy of the blood test. *See Schmerber v. California,* 384 U.S. at 770–71. Approximately one-half hour had elapsed from the time of the collision until Lieutenant Smith met the defendant. It was nearly midnight; furthermore, Lieutenant Smith was unsure whether any of the four district court judges in the general Exeter area were at home. While Lieutenant Smith conceded at the suppression hearing that it would have taken at least fifteen minutes to prepare an application for a warrant along with the supporting affidavit, he also testified that he had no idea how long it might have taken to actually obtain a search warrant.

Lieutenant Smith testified that he deemed it "important not only to the State, but certainly to Mr. Wong, to obtain [a blood] sample just as quickly as we possibly could."

We have recognized that the delay inherent in obtaining an *arrest* warrant at night "can be too great." *State v. Schneider, supra* at 246, 470 A.2d at 890.

> "It is common knowledge that an arrest warrant, like any legal document, is considerably more difficult to obtain at night than during working hours. *At least one court has held this to be a significant factor in validating warrantless searches, when delay could result in the destruction of evidence.*"

*Id.* (emphasis added).

We are persuaded of the cogency of the reasoning employed in *Schneider*. Accordingly, we hold that the State has proven by a preponderance of the evidence that the special circumstances which confronted Lieutenant Smith, including the established fact of metabolization of blood alcohol content and the late night incident, were sufficiently exigent to justify the warrantless blood test as an appropriate incident to the defendant's arrest. *See Schmerber v. California,* 384 U.S. at 771; *State v. Thorp,* 116 N.H. at 308, 358 A.2d at 660.

IV. *Validity of Evidentiary Rulings—Grindle*

The defendant's first evidentiary objection is that the trial court erred in admitting into evidence the diagram of the collision scene drawn by Officer Douglas.

"The decision to admit documentary evidence falls within the sound discretion of the trial court." *State v. Dustin,* 122 N.H. 544, 549, 446 A.2d 1186, 1189 (1982). On appeal, the proper inquiry is whether the trial court incorrectly found that the document's probative value outweighed the possible prejudice it might have produced. *Id.*

The trial record indicates that the diagram prepared by Officer Douglas was marked for identification purposes after an unrecorded bench conference. Following the defendant's cross-examination of Officer Douglas, through whom the State offered the diagram into evidence, there was another off-the-record discussion at the bench, and the diagram was subsequently admitted into evidence "subject to exception."

At trial, the defendant failed to specify any reasons on the record for his purported objection to the admission of the diagram. "It is well established that a party must specify the grounds for his objection so that the court will have an opportunity to correct any

possible error." *State v. Fournier*, 123 N.H. 777, 779, 465 A.2d 898, 900 (1983).

Without a record of the specific basis for the defendant's objection, we are unable to conclude that the trial court abused its discretion. The defendant is thus precluded from raising the admissibility of Officer Douglas' diagram on appeal. *Id.*

The defendant's second evidentiary objection is that the trial court erred in admitting photographs and measurements of the exterior of his automobile, in alleged violation of the Fourth and Fourteenth Amendments of the United States Constitution. Specifically, the defendant asserts that the trial court's pretrial suppression order excluding evidence obtained from the automobile's interior prevents introduction of evidence concerning the exterior of the defendant's automobile. The defendant did not raise State constitutional claims below, and the trial court limited its holding to claims under the Federal Constitution. *See State v. Miskolczi supra.*

When the defendant entered the Milford police station, his automobile was parked on a public street next to the police station. The Milford police took control of the defendant's automobile at 10:30 p.m., May 15, 1982, and held the vehicle until 6:00 p.m., May 16, 1982, when the automobile was searched. No search warrant was obtained.

The trial court relied exclusively on the United States Supreme Court's opinion in *Cardwell v. Lewis*, 417 U.S. 583 (1974), in its decision to admit evidence of the automobile's exterior. In *Cardwell*, subsequent to the defendant's arrest, the defendant's car was impounded by police and towed from a public parking lot to a police lot where it was searched the next day. *Id.* at 587–88. The *Cardwell* court said that where the search of an automobile is

> "limited to the examination of the tire on the wheel and the taking of paint scrapings from the exterior of the vehicle left in the public parking lot, we fail to comprehend what expectation of privacy was infringed. Stated simply, the invasion of privacy, 'if it can be said to exist, is abstract and theoretical.' [citation omitted] Under circumstances such as these, *where probable cause exists*, a warrantless examination of the exterior of a car is not unreasonable under the Fourth and Fourteenth Amendments."

*Id.* at 591–92 (emphasis added).

Here, it is clear from our earlier exposition of the record that the police had probable cause to search the exterior of the

defendant's automobile. Officer Rasmussen testified that the defendant stated at the police station that he had hit a bicycle. Officer Rasmussen also stated that while accompanying the defendant to his automobile to obtain the defendant's driver's license and registration, he inadvertently observed extensive damage to the defendant's automobile. In sum, the evidence established that the defendant's automobile was the instrumentality used in the commission of the offense for which he was arrested. *Id.*

Likewise, the seizure of the defendant's automobile is valid under *Cardwell v. Lewis, supra* at 592–93. The *Cardwell* court rejected the argument that "because the police impounded the car prior to the examination, which they could have made on the spot, there is a constitutional barrier to the use of evidence obtained thereby." *Id.* at 593. Further, the Court stated that it knew of

> "no case or principle that suggests that the right to search on probable cause and the reasonableness of seizing a car under exigent circumstances are foreclosed if a warrant was not obtained at the first practicable moment. Exigent circumstances with regard to vehicles are not limited to situations where probable cause . . . arises only at the time of the arrest. [citation omitted] The exigency may arise at any time, and the fact that the police might have obtained a warrant earlier does not negate the possibility of a current situation's necessitating prompt police action."

*Id.* at 595–96.

Here, even though the Milford police could have placed the defendant's automobile in custody and then obtained a warrant authorizing its seizure, "[t]his course of conduct . . . would not have been any less intrusive for constitutional purposes than that chosen by the police." *State v. Bean*, 120 N.H. 946, 948, 424 A.2d 414, 416 (1980).

> *No. 83-358 State v. Wong affirmed;*
> *No. 83-481 State v. Grindle*
> *affirmed.*

DOUGLAS, J., concurred specially; KING, C.J., and BATCHELDER, J., dissented in part in *Grindle.*

DOUGLAS, J., concurring specially: I concur in the portion of part III, A, wherein the majority holds that the due process clause did not mandate that defendant Grindle be provided an additional breath sample for independent analysis, while reaffirming my special concurrence in *State v. Cornelius*, 122 N.H. 925, 928–29, 452 A.2d 464, 465–66 (1982). It is significant that the facts in the instant

case occurred prior to February 1, 1983. Had they occurred after that date, a second breath test sample or its functional equivalent would have been required by the due process clause of the New Hampshire Constitution. N.H. CONST. pt. I, art. 15.

KING, C.J., with whom BATCHELDER, J., joins, dissenting in *Grindle:* While I agree with the majority's analysis of section II of the negligent homicide statute, RSA 630:3, II, and the disposition of Grindle's sufficiency claim, I am unable to join in the court's reaffirmation of *State v. Cornelius*, 122 N.H. 925, 452 A.2d 464 (1982), in part III, A of the opinion. For the reasons set forth in Justice Batchelder's dissent in *State v. Cornelius, supra* at 929–31, 452 A.2d at 467–68, in which I concurred, I continue to believe that when a breath test is administered at the direction of a law enforcement officer, the defendant has a due process right under part I, article 15 of the New Hampshire Constitution to have a second sample preserved for independent analysis. Accordingly, the results of a breathalyzer test should be inadmissible unless the State preserves a second breath sample or its functional equivalent for independent testing by the defendant. I would therefore vacate the judgment of the superior court in *Grindle* and remand for further proceedings.