Strafford
No. 89-070

THE STATE OF NEW HAMPSHIRE

v.

RICHARD MCCUE

April 23, 1991

*John P. Arnold*, attorney general (*Tina L. Nadeau*, attorney, on the brief and orally), for the State.

*Richard P. Howe* and *Richard P. Howe, Jr.*, of Lowell, Massachusetts (*Messrs. Howe* on the brief, and *Richard P. Howe* orally), for the defendant.

PER CURIAM. The defendant appeals from a jury verdict in the Superior Court (*Temple,* J.) finding him guilty of the first degree murder of Alene Courchesne. He challenges his conviction on two grounds, claiming first, that the circumstantial evidence for conviction was insufficient since it did not support the exclusion of all rational conclusions other than the defendant's guilt. Second, he argues that the trial court committed reversible error in denying a motion *in limine* seeking to exclude the investigating officers' use of the term "drag marks" in reference to the area where the body was discovered. We affirm.

On October 18, 1987, at approximately 4:45 p.m., a thirteen-year-old boy, Morgan Edgerly, discovered the body of Alene Courchesne lying face down in a mud puddle in the wooded area adjacent to the northbound lane of the Spaulding Turnpike between exits 13 and 14 in Rochester. He quickly summoned a police officer from the nearby mall. When the investigators arrived at the scene, they observed that the victim was wearing a light blue sweatsuit and that her pocketbook and its contents, together with a jacket and a pair of women's white boots, were strewn about the body. On the left side of the body were one full and one partial footwear impression.

In the soft shoulder next to the breakdown lane of the turnpike, the police observed and photographed a set of tire tracks and another set of impressions in the gravel leading down to the mud puddle and the body, indicating that the victim had been dragged through the dirt, over the grass and into the puddle. The tire tracks appeared to run in a half-circle beginning at the breakdown lane and running through the soft gravel shoulder and then back onto the highway; part way through their path were two spin marks where the rear wheels had sunk into the ground. An examination of the tire tracks revealed that the vehicle responsible for making the impressions appeared to have winter tires on the rear and summer tires on the front. By measuring from the spin mark to the point where the front tire began to turn, the police were able to calculate what they thought was the vehicle's wheelbase, which is the distance between the front and rear axles. Although the officers were unable to obtain an accurate measurement because of the condition of the gravel at the spin marks, the approximate wheelbase measurement was 9' 6". The police made several other measurements of the tire tracks and photographed the area extensively. In addition to the tire tracks and the footwear impressions, the police observed a large wet area approximately three feet north of the right rear spin mark, which proved to have been caused by the primary ingredient of antifreeze.

Dr. Roger Fossum, M.D., the State's Chief Medical Examiner, observed the body at approximately 7:00 p.m. on October 18, 1987, and stated that full rigor mortis had set in. The police officers at the scene had previously informed him that the body was rigid when it was first found. At the time of the autopsy the following morning at 9:00 a.m., Dr. Fossum noted that the body was still in a state of rigor mortis. Based on these observations, and the fact that rigor mortis remains in the body for 24–36 hours after death, Dr. Fossum concluded and testified at trial that Alene Courchesne had died between 2:00 a.m. and 5:00 a.m. on October 18, 1987. He further testified that the death probably occurred closer to 2:00 a.m., but admitted that the size and weight of the body may have affected what time the rigidity had set in. In addition to examining Ms. Courchesne's body to determine the cause of her death, which he declared to be asphyxiation by strangulation, Dr. Fossum also recorded all other non-fatal injuries to her body. Ms. Courchesne sustained contusions and abrasions to her head and neck area and a laceration over her right eye. In Dr. Fossum's opinion a blunt force trauma, such as a blow from a fist or the back of a hand, caused both the contusions and the laceration, which Dr. Fossum testified would cause a substantial trickle of blood. Apart from the injuries to her head and neck, Dr. Fossum found an abrasion on her left shin, which he stated was post-mortem and likely the result of someone's mishandling her body. Samples of bodily fluids were taken and found to indicate that Alene Courchesne had consumed an alcoholic beverage and smoked marijuana thirty to ninety minutes before her death.

The first stage of the police investigation into the death centered on an individual named Barry Lazaro. Shortly after the police arrived at the scene but prior to their "processing" of the area, Mr. Lazaro drove a Ford Bronco approximately 250 yards on a dirt path through the woods from a department store parking lot near the turnpike and backed up to a point approximately six feet from the body. He got out of the vehicle and was walking toward the rear, approximately seven to ten feet from the body, when he was suddenly observed by Officer Trueman, who was guarding the area from the breakdown lane of the turnpike. Officer Trueman yelled to Mr. Lazaro, whom he recognized from prior encounters, to keep him from approaching the body. Mr. Lazaro quickly climbed back into his vehicle and drove away.

Shortly thereafter Mr. Lazaro was apprehended by the police and brought to the Rochester police station. Asked to explain his presence at the crime scene, Mr. Lazaro claimed that he had been eating

a Burger King dinner in his vehicle at the parking lot and had needed to go to the bathroom. He said he drove 250 yards down a dirt road behind Rich's Department Store allegedly to find a private spot to do so. Despite the earlier urgency, however, Mr. Lazaro did not use the bathroom at any time during several hours of confinement and interrogation at the Rochester police station. The police were nevertheless satisfied with Mr. Lazaro's answers and released him. At trial, Mr. Lazaro's girl friend, Connie Lynn Osborne, testified that on the night of the murder she and Barry Lazaro were together from about 9:00 p.m. onward. They arrived at Ms. Osborne's house at about 11:30 p.m. and spent the night there.

The police also discovered in the course of their preliminary investigation that the defendant, Richard McCue, had been with the victim the night before and was the last person seen with her. The police, therefore, focused their investigation upon him.

The defendant and Ms. Courchesne met on Friday, October 16, 1987, two days before her death, when the defendant stopped, late in the afternoon, at the 202 Quickie Convenience Store in Rochester where Ms. Courchesne worked. They engaged in conversation and agreed to meet that evening for a drink. The defendant testified at trial that when he returned to the 202 Quickie around midnight, he encountered Ms. Courchesne and a man, whom he later claimed was Barry Lazaro, having an argument. This identification was later contradicted by Veronica Cormier, who was in the convenience store at the time. In any event, after the man left the store, Ms. Courchesne and the defendant went briefly to Colby's Bar and then continued on to Ms. Courchesne's apartment at 20 Academy Street in Rochester to watch a movie and have another drink. The defendant left her apartment after they had agreed to meet again the following evening.

On October 17, 1987, the defendant called Ms. Courchesne around 10:30 or 11:00 p.m. from his friends' apartment at 12A Springfield Court; and, after calling her a second time, the defendant arranged to meet her at her apartment. The defendant arrived at 20 Academy Street at approximately 11:30 p.m. and waited in the living room while Ms. Courchesne finished dressing. While he was waiting, a person arrived whom Ms. Courchesne introduced as Russell Healy. When Mr. Healy asked where he could buy some cocaine, the defendant suggested "Colby's Ol' Place." Mr. Healy said "Okay" and departed. Approximately ten minutes later, Mr. Healy returned to the apartment to borrow some money. In the intervening time period, Ms. Courchesne had received a collect phone call and was in the

bathroom talking. When Mr. Healy reappeared, Ms. Courchesne came out of the bathroom, handed the phone to him and said "It's your brother." Mr. Healy spoke on the phone for a minute and at one point looked at the defendant and said "No, nobody else is here." Mr. Healy testified that Ms. Courchesne was shaving her legs in the living room, that she had cut them and had wiped the blood off her legs with a towel. The defendant, however, testified only that she had a razor in her hand when she came out of the bathroom, and that he had seen no cuts and no blood. Mr. Healy left after borrowing ten or fifteen dollars from Ms. Courchesne, and the defendant and Ms. Courchesne left shortly thereafter. Since they had planned to watch movies with the defendant's friends Cheryl and Martin Maguire, they drove back to 12A Springfield Court. Along the way, however, Ms. Courchesne and the defendant decided instead to go out for drinks, although they first stopped by Springfield Court and spoke briefly to the Maguires. Mrs. Maguire testified that the defendant and Ms. Courchesne arrived at Springfield Court around midnight.

The defendant and Ms. Courchesne then proceeded to Colby's to get a drink. The defendant drove a 1977 red Ford pickup truck with a cap that was white on top with a ladder rack and dark-colored windows on each side that belonged to his boss, Robert Parent. At Colby's, the defendant and Ms. Courchesne met William Pelley, who called himself "Budweiser," and Ron Nesbit. After Colby's closed at 1:00 a.m., Mr. Nesbit invited the defendant and Ms. Courchesne to the Moose Club, and Mr. Pelley apparently tagged along. Once they all arrived at the Moose Club, Mr. Nesbit had the defendant fill out a membership application so that Mr. Pelley and Ms. Courchesne could come in as the defendant's guests.

Mr. Nesbit also testified that a group of people, including himself, the defendant, Ms. Courchesne, Mr. Pelley and possibly another person named Rick Marchand, went outside and smoked marijuana produced by the defendant. The defendant and Mr. Pelley, however, denied smoking marijuana that night. Mr. Nesbit testified that, subsequent to their smoking marijuana, he, the defendant, Ms. Courchesne and some other people went back inside and played a couple of games of pool. According to Mr. Nesbit, the defendant and Ms. Courchesne began to argue over whether or not they should stay or leave. The defendant maintains that they had no such argument. There was contradictory testimony about whether Ms. Courchesne left first, or the defendant did, or whether they left together. The testimony of the various witnesses, however, was consistent with regard to the time, if not to the manner, of their departure.

The defendant and Ms. Courchesne left the Moose Club at approximately 2:00 a.m. and drove to 12A Springfield Court, where they engaged in sexual intercourse. According to the defendant, they had intercourse in the small bedroom off the living room. Mrs. Maguire, however, who was sleeping in the master bedroom, testified that she heard Ms. Courchesne and the defendant in the living room. Mrs. Maguire heard Ms. Courchesne say "slow down" and a moment or two later heard the defendant say "All right," and after a pause, "Get dressed and I'll take you home." Mrs. Maguire said they then stopped having intercourse. The defendant contends that these statements were made in a different context, that they had already finished having intercourse and that Ms. Courchesne's comment was in regard to his hurried attempt to get dressed. In any event, the two got dressed and went outside to the truck. Mrs. Maguire testified that she heard Ms. Courchesne's raised voice and then the truck "revving" for about five minutes before they departed. Approximately five minutes later, Mrs. Maguire got up, went to the bathroom, and placed a phone call to the doughnut shop where she worked in Lowell, Massachusetts. The New England Telephone record indicated this call was placed at 2:42 a.m.

The defendant testified that he drove Ms. Courchesne to her home on 20 Academy Street and then returned immediately to Springfield Court. He stated that when they arrived at her apartment, she got out of the truck and was walking toward the door when he realized that she had left her boots on the floor of the truck and her pocketbook on the dashboard. The defendant called to her to come back to the truck, where he handed her those items.

When the police questioned the defendant on Tuesday October 20, his version of the night's events was mostly consistent with the facts as stated above except that he told the police that he had intercourse with Ms. Courchesne in the truck. The defendant later called the police and told them that they had in fact been in the house and not the truck. He explained that his reason for providing his first story was that he did not want Diana Parent to know he had slept with a woman in her child's bedroom, but after he told Mrs. Parent about the situation, she advised him to inform the police.

The following morning, Sunday, the defendant awoke between 7:00 and 8:00 a.m. The Maguires testified that they found the defendant sleeping on the floor of the living room when they got up and they noticed no mud, dirt or blood on either the defendant's clothes, in which he was sleeping, on his boots in the hallway, or on the stairs. After eating with the Maguires, the defendant drove the truck to

Lowell, Massachusetts, where he spent the entire day working. Mr. Maguire testified that while they were eating breakfast together, the defendant said he would not be seeing Ms. Courchesne anymore.

At about the time Mrs. Maguire placed her phone call to the doughnut shop, David Prescott was traveling southbound on the Spaulding Turnpike heading to a 24-hour Purity Supreme store. He testified that he saw a dark-colored pickup truck with a white cap parked just after exit 14 on the Spaulding Turnpike at approximately 2:30 a.m. During the investigation and at trial, Mr. Prescott was unable to identify the defendant's truck positively as being the one he saw on the highway, but he did state that it was similar to the one he had seen in that it was an older model with a cap on it.

On October 21, 1987, the police seized the truck after obtaining the consent of the owner, Robert Parent. The truck was examined by police criminalists and, in the course of that examination, soil samples were taken from the floor of the passenger compartment. Soil samples were also taken from various places near where the body of Ms. Courchesne was found, and while these samples were all compared in some fashion, no results were offered at trial. After the police collected the evidence from the truck, Officers Heon and Moore drove the truck back to Mr. Parent. On their way, the truck developed some mechanical problems with the clutch pedal. When Officer Heon pulled off the road and lifted the hood, Officer Moore noticed that the radiator hose was leaking a substantial amount of antifreeze. Mr. Parent later explained that the truck would leak antifreeze at a fast rate if one accelerated too quickly because the motor would lift causing the fan to cut the top radiator hose and the clutch rod to drop out.

From the investigators' examination of the 1977 Ford truck, they discovered that it had two summer tires on the front and two winter tires on the back. In addition, Officer Boudreau, the State's tire and footwear expert, explained that several distinct tread characteristics left by the tire at the scene matched the tread on the tire of Mr. Parent's truck. Specifically, Officer Boudreau testified that the width of the ridge pattern both on the known tire and in the impression left at the scene was $7/16$ of an inch, and that the angle at which the raised ridge changed direction was 120 degrees on both the impression and Mr. Parent's tire. Officer Boudreau's conclusion was that the impression at the scene could have been caused by one of Mr. Parent's tires.

One apparently exculpatory fact was that Mr. Parent's truck had a wheelbase measurement of 11′ 5″, whereas the approximate wheelbase as calculated from the tire impressions at the scene was 9′ 6″, a

twenty-three-inch discrepancy. Furthermore, the wheelbase of the truck Mr. Healy had been driving was 9' 10", only four inches greater than the wheelbase the police had calculated. The police also measured the wheelbase of Mr. Lazaro's vehicle and found it to be 7' 10¾", with thus a nineteen-inch discrepancy from the police calculation. In the face of these seeming discrepancies, the police explained that from the outset they were unable to obtain an accurate measurement from the tracks left at the scene. Despite the difference between the wheelbase of the '77 Ford and the approximate wheelbase measurement at the scene, Officer Boudreau concluded that the truck at the scene could have been the '77 Ford.

In addition to testifying about the tire impressions, Officer Boudreau also compared the full footwear impression left at the scene to a sample imprint made with the boot the defendant wore on October 18, 1987. He found that parallel lines in the impression at the scene corresponded in measurement to the parallel lines on the test imprint of the sole of the defendant's boot. He also found that the tread of the scene impression jutted out at the arch in a manner similar to the way the defendant's boot did in the test impression. The State's expert also conducted comparisons between the partial impression at the scene and the test impression of the defendant's boot. He found that the spacing between the raised ridges cause by the boot's slipping at the scene was the same as the spacing between the ridges made with the defendant's boot. Officer Boudreau attributed any differences between the defendant's boot and the footwear impression to the suction of the mud when the foot was lifted out of the mud.

The defendant's tire and footwear expert, Peter McDonald, contradicted the State's expert on almost every one of his conclusions. Based on the information provided to him by the police, which included the police reports of October 23 and November 6 and their photographs, Mr. McDonald rendered an opinion positively eliminating the '77 Ford driven by the defendant from the area where the body was found. In reaching this conclusion, Mr. McDonald relied primarily on the fact that the wheelbase measurements were so dissimilar. He also testified about the footwear impressions, noting several inconsistencies between the full footwear impression and the defendant's boot. He compared the photographs from the scene where the body was found to the defendant's test imprint and observed that the defendant's boot was longer, wider and of a different shape. He also noted that the imprint at the scene had a sharp curve at the leading edge of the heel, which was not present on the defendant's boot. The defendant's boot had sharp, well-defined edges and

there were none, according to Mr. McDonald, comparable to the imprint left at the scene. Mr. McDonald also examined the photographs of the partial footwear impression and found that impression to be inconsistent with the defendant's boot. On the basis of these and other inconsistencies, Mr. McDonald positively eliminated the defendant's boot as the source of the impression at the area where Ms. Courchesne's body was found.

In addition to testimony of the defendant's tire and footwear expert and the defendant's own testimony, the defense introduced other evidence for exculpatory purposes, at least, through the following witnesses' testimony. Christine Courchesne, the ten-year-old daughter of Alene Courchesne, testified that late on the night of October 17 or early in the morning of October 18, 1987, while alone in her mother's apartment, she was awakened by someone banging on the door. Christine further testified that she was again awakened at 3:00 a.m. by the sound of a car or truck motor.

Detective Robert Pease of the Rochester Police Department testified that he interviewed Christine Courchesne on three separate occasions in October of 1987, the first taking place approximately seven hours after the victim's body was found. Christine told Detective Pease that at midnight, Mr. Healy banged on the door, looking for her mother. She said that she knew it was Mr. Healy because she saw his truck. Christine also told Detective Pease that at 3:00 a.m., on the 18th, she "got up, and went to see if [her] Mom was awake, and saw she wasn't, so [she] just looked out the window of the apartment to see if he was coming in and he didn't so [she] went back to bed." Detective Pease never asked Christine who "he" was.

According to Detective Pease, Christine said she awoke again at 6:00 a.m. on the 18th when she heard someone banging on the shower walls and a voice that sounded like Mr. Healy say, "Where's my pants?" She said also that she observed a man, who looked like Russell Healy, in the doorway of her bedroom. Christine also told Detective Pease that on October 18th she discovered a pool of blood in the shower stall and blood on her mother's bicycle seat located in the front hall of 20 Academy Street. The police investigated the premises at 20 Academy Street on Friday, October 23, 1987, however, and found no blood stains.

Cindy Beckman, the oldest daughter of Alene Courchesne, testified that several days after her mother's funeral, she and her grandmother went to 20 Academy Street and found a towel with blood on it "like someone wiped something up." Although Mr. Healy acknowledged that the towel Ms. Beckman found was similar to the towel he

claimed Ms. Courchesne used to wipe the blood from her legs, there were no indications that the victim had suffered any cuts or nicks on her legs.

Elizabeth Ziolkowski, hired by the defendant in late September 1988, testified as an expert in forensic chemistry on her examination of the premises at 20 Academy Street for evidence of blood. Ms. Ziolkowski found blood droplets in the hallway and determined that the spray of such droplets could have come from a source approximately five feet from the ground. Ms. Ziolkowski tested the droplets and determined that the substance was human blood, but she was unable to determine its type.

Brenda Jacques, who lived at 20 Academy Street, testified that in early October 1987, she overheard a conversation at 20 Academy Street between the victim and Mr. Healy, who had threatened to kill the victim if she called the police and informed on him as to some unspecified matter. Ms. Jacques also testified that on October 18, 1987, at approximately 9:00 a.m., several hours before Morgan Edgerly or the Rochester police had discovered the body, her landlord, Philip Koenig, told her that the victim's body had been found in back of Rich's Department Store. Mr. Koenig, however, denied that he had had such a conversation.

Mr. Koenig testified that on Monday, October 19, 1987, he went to the Rochester police station and told Officer Moore that he would keep the victim's apartment secured. Mr. Koenig admitted later that he had broken his word by entering the victim's apartment for the purpose of removing a gun belonging to Darren Healy, Russell Healy's brother.

William Pelley and Russell Healy, both of whom knew the victim and were seen with her shortly before her death, made several conflicting statements about their whereabouts and activities on October 17, 1987. Mr. Healy testified that on Saturday, October 17, 1987, he met Mr. Pelley at 5:30 p.m. Yet, Mr. Pelley testified that he drove around drinking with Mr. Healy starting at 11:00 a.m. Mr. Pelley also stated that their first trip to 20 Academy Street was at 12:30 p.m. for the purpose of obtaining drugs. Mr. Healy, however, claimed that they first went to 20 Academy Street at 8:30 p.m. Mr. Pelley stated that the two went to 20 Academy Street at least four times that day, whereas Mr. Healy said they only went twice. On the Saturday in question, Mr. Healy said he went to his home alone and used cocaine intravenously. Mr. Pelley, however, said he was with Mr. Healy all day and the pair went to Healy's house twice for the purpose of ingesting cocaine.

Finally, Jean Eisenstat, who lived at 16 Academy Street, testified that on October 17, 1987, she saw Mr. Healy come out of 20 Academy Street at 11:30 p.m. and get into his truck, where Mr. Pelley was waiting. Ms. Eisenstat further stated that she saw Mr. Healy leaving the building again at 1:30 a.m. Mr. Healy testified that he left the victim's apartment for the last time at 11:30 p.m. and that he circled town for a short period of time before he went home.

■■ The defendant's first claim on appeal is that the evidence as recounted above was insufficient to prove that he was guilty of the first degree murder of Ms. Courchesne. On appeal, the defendant has the burden to demonstrate that no rational trier of fact, viewing the evidence in the light most favorable to the State, could have found guilt beyond a reasonable doubt. *State v. Murray*, 129 N.H. 645, 650, 531 A.2d 323, 327 (1987). In a case like this one, where there is only circumstantial evidence to support the conviction, the evidence must be sufficient to allow the jury to exclude all rational conclusions other than the defendant's guilt. *State v. Cyr*, 122 N.H. 1155, 1160, 453 A.2d 1315, 1318 (1982); *State v. Danskin*, 122 N.H. 817, 818, 451 A.2d 396, 397 (1982). In determining whether the jury was so entitled, we recognize that it may draw all reasonable inferences from circumstantial evidence, just as it may from direct evidence. *See State v. Wong*, 125 N.H. 610, 624, 486 A.2d 262, 271 (1984). Having reviewed the entire trial transcript, we conclude that the jury could exclude all rational conclusions other than the defendant's guilt.

The following summation of the evidence, viewed in the light most favorable to the State, indicates that the jury had an ample basis to identify the defendant as the person who committed the first degree murder of Ms. Courchesne. There was evidence that the victim was killed between 2:00 a.m. and 5:00 a.m. on October 18, 1987, more probably earlier rather than later in that time span, and that approximately thirty to ninety minutes before her death, she consumed marijuana and alcohol. During that time period, according to the evidence, the defendant was with Ms. Courchesne. Also at 2:30 a.m., give or take ten minutes, Mr. Prescott saw a dark-colored truck with a cap parked on the Spaulding Turnpike between exits 13 and 14, the area where the police eventually found Ms. Courchesne's body.

The defendant, in fact, had been driving an older model, dark-colored pickup truck with a cap on the date of Ms. Courchesne's death. After an evening of numerous drinks, the defendant brought Ms. Courchesne back to Springfield Court, whereupon Mrs. Maguire testified that she overheard the defendant and Ms. Courchesne engag-

ing in sexual intercourse. Ms. Courchesne told the defendant to "slow down" and the defendant responded, "All right, get dressed. I'll take you home." After the defendant and Ms. Courchesne got into the truck, Cheryl Maguire heard Ms. Courchesne's raised voice and the engine "revving" for about five minutes before they departed.

Approximately five minutes after the defendant and Ms. Courchesne drove off, Mrs. Maguire got up and placed a phone call to Massachusetts. New England Telephone recorded that phone call as having been made at 2:42 a.m. The State also established, through the testimony of Officer Moore, that the distance between the area where Ms. Courchesne's body was found and 12A Springfield Court was 1.8 miles. Officer Moore testified that it took him four minutes to drive the 1.8 miles. Consistent with the above is the further fact that Mr. Prescott testified that on October 18, 1987, at 2:30 a.m., give or take ten minutes, he saw a dark-colored pickup truck pulled off the Spaulding Turnpike, near the area where the body was found.

The State's further evidence was that the truck that left tire marks in the gravel at the scene had summer tires on the front and winter tires on the rear. Consistent with that observation, the truck the defendant was driving had summer tires on the front and winter tires on the rear. In addition, the spacing between raised ridges of the tire impression at the scene matched a test impression made with the tire of the truck the defendant drove that night. Experts found a stain in the mud at the crime scene caused by antifreeze, which was significant in light of testimony by the truck's owner that he had filled the radiator with antifreeze approximately two weeks before the murder and that mechanical problems caused the truck to leak antifreeze. The defendant wore boots the night of Ms. Courchesne's death, and the boot impressions left at the scene were consistent with test impressions of the defendant's boots.

Moreover, no one was found, other than the defendant, who saw Ms. Courchesne alive after they left the apartment together. The following morning, the defendant told his friend, Mr. Maguire, that he, the defendant, would not be seeing Ms. Courchesne again. In addition to the evidence presented at trial, the State, in its closing argument, commented on the defendant's testimony and characterized a few of his statements as incriminating. These included the fact that he made a point of explaining how his fingerprints might appear on the victim's boots and pocketbook and that he said he pulled off the Spaulding Turnpike, near where the body was found, on his way down to Lowell, Massachusetts, on the same day the body was discovered.

The defendant attempts to point the finger toward two other witnesses for the murder of Ms. Courchesne. The defendant first claims that Mr. Lazaro could have been the murderer, since he pulled up behind the body shortly after the police had arrived. It was proved at trial, however, that Mr. Lazaro's vehicle had a smaller wheelbase; and, more importantly, he offered a plausible explanation for his whereabouts that night, an alibi that was substantiated by his girl friend. The defendant also claims that the victim had argued with Mr. Lazaro at the store, whereas Ms. Cormier testified that Mr. Lazaro was not the man with whom Ms. Courchesne had argued.

The defendant next claims that Mr. Healy may have murdered Ms. Courchesne. To support this claim, he relies solely on the testimony of Christine Courchesne, the victim's young daughter. She testified at the trial that she heard Mr. Healy's voice in the shower around 6:00 a.m. on the morning of the murder. One year earlier, however, she told police she did not know whose voice she heard. Nor did she ever testify that she heard her mother then, or that she had any indication that her mother came back to their apartment on the day or morning of the murder. Further, there was inadequate evidentiary support for the theory that the murder took place in the apartment at 20 Academy Street. Mr. Healy testified that he left the victim's apartment for the last time at 11:30 p.m. and that he went home shortly thereafter. Although Ms. Eisenstat, Ms. Courchesne's neighbor, contradicted Mr. Healy and testified that she saw him leave at 1:30 a.m., no one, except Christine, indicated that Mr. Healy could have been there any later than 1:30 a.m. The jury heard Christine's testimony, judged her credibility and chose not to believe that Mr. Healy was responsible for the murder.

Finally, the defendant argues that since his tire expert positively eliminated the defendant's truck as the one that left tire marks at the scene, the conviction cannot stand. First, he makes this claim even against his expert's own admissions that his conclusions were based on faulty information. The defendant's expert relied totally on police reports containing the approximate wheelbase measurements. Even though the officers testified they did not have enough information at the scene to make appropriate calculations, the defendant's expert relied on that information. Furthermore, even if the jurors accepted the basis of his testimony, they were entitled to weigh the credentials of all the experts and to believe whomever they chose. *See State v. Smith*, 127 N.H. 433, 436–37, 503 A.2d 774, 776 (1985); *Roy v. Perrin*, 122 N.H. 88, 94, 441 A.2d 1151, 1155 (1982). In this case, the jurors believed the State's expert, who testified that markings left at the

scene were consistent with the tire treads on the truck the defendant drove that night.

■ In sum, the defendant put forth alternative theories to explain the murder of Ms. Courchesne and the jury chose to believe none of them. Since the State presented substantial evidence to support its theory that the defendant was in fact the murderer, the jury could properly find guilt beyond a reasonable doubt. We note that this conclusion was also reached by the trial court in its denial of the defendant's motion to vacate jury verdict.

■■ The defendant's second and final contention is that the trial court incorrectly denied the defendant's motion to exclude the use of the term "drag marks" by investigating officers while testifying about certain impressions at the crime scene. The offensive testimony to which the defendant then and now objects came from various investigating officers who, in the course of their narration, referred to "drag marks" at the scene leading from where the vehicle apparently parked, through the grassy area and toward the direction of the body. The bases of the defendant's objection are, first, that the investigating officers lacked personal knowledge as to the source or nature of the marks, in derogation of New Hampshire Rule of Evidence 602, and second, that the characterization of those marks as "drag marks" was unduly prejudicial, perhaps in violation of Evidence Rule 403, although no such specific reference was made. The officers who testified each had personal knowledge of what they observed at the scene and, under Evidence Rule 701, could permissibly opine that the marks they saw were "drag marks." Furthermore, we do not see the prejudice from the characterization of those marks as "drag marks." The jurors had available to them numerous photographs from which they could make their own determination as to what the marks depicted. Even if the investigating officers had not described the marks they saw as "drag marks," the defendant would not be in a much better position; there were still the photographs depicting the tire tracks, the body and the boot prints. More important, the issue in the trial was not whether the body had been dragged from a vehicle, but who had dragged it. To constitute error reversible on appeal, the defendant must show that the ruling "was clearly untenable or unreasonable to the prejudice of his case." *State v. Hotchkiss*, 129 N.H. 260, 264, 525 A.2d 270, 272 (1987) (quoting *State v. Whitney*, 125 N.H. 636, 639, 484 A.2d 1158, 1160 (1984)). The

defendant has failed to meet this standard and, accordingly, we affirm his conviction.

*Affirmed.*

HORTON, J., did not sit; BROCK, C.J., dissented.

BROCK, C.J., dissenting: I agree with the majority that the defendant's conviction must be sustained unless, after viewing the evidence in a light most favorable to the State, we conclude that no rational trier of fact on the evidence presented could have found proof of the offense beyond a reasonable doubt. *State v. Wong,* 125 N.H. 610, 624, 486 A.2d 262, 271 (1984). While circumstantial evidence can support a murder conviction, when the State's case rests entirely upon such evidence, all rational conclusions except that the defendant was guilty must be excluded. *State v. Meloon,* 124 N.H. 257, 259, 469 A.2d 1316, 1318 (1983) (quoting *State v. Hopps,* 123 N.H. 541, 544, 465 A.2d 1206, 1208 (1983)). After reviewing the voluminous record and applying the above standards, my conclusion differs from that of the majority. I would hold that the evidence was legally insufficient to prove beyond a reasonable doubt that the defendant murdered Alene Courchesne.

Clearly, the record provides evidence indicative of the defendant's guilt. Perhaps the fact most damaging to his defense is that he was the last person known to have seen Alene Courchesne alive. By his own admission, he dropped her off at her apartment during the period specified by the medical examiner as the likely time of death.

The record also includes evidence which casts doubt upon the defendant's guilt. Although the victim's bleeding body was left in a mud puddle, witnesses observed that the defendant's pants and boots were not bloody or muddy on the morning following the murder. There is no evidence in the record that mud or blood was found in or on the pickup truck driven by the defendant. Further, there is no evidence to indicate that the defendant had been involved in a struggle.

Much of the State's evidence came from the scene where the body was found. It relied upon expert testimony regarding the two footprints in the mud, one full and one partial, and on the tire tracks in the dirt next to the highway. Results from the initial police investigation, *i.e.,* the size of the footprint and the wheelbase of the vehicle, appear to be inconsistent with the defendant's guilt. Nevertheless, the State's expert attempted to explain away these inconsistencies and testified that, in his opinion, the footprints and tracks *could* have been caused by the defendant.

The witness David Prescott, who observed a pickup truck beside the highway on the night of the murder, could not positively identify the defendant's truck as the one he saw. He testified that the truck he had seen was a dark color and had a white cap. While a portion of the cap on the truck driven by the defendant is white, the sides are for the most part a dark color and, on the night of the murder, the top was covered by construction ladders and staging.

Christine Courchesne, the victim's young daughter, was staying in her mother's apartment on the night of the murder. In interviews with police immediately following the discovery of the body, she said that she heard someone in the apartment banging on the shower walls at 6:00 a.m. and a man's voice say "Where's my pants?" She also observed a man in the doorway of her bedroom. On the following day, she reported discovering a pool of blood in the shower stall and finding blood on the seat of her mother's bicycle, which was located in the hallway of the apartment building. Despite this information, the police failed to search the victim's apartment for five days after discovering her body.

Cindy Beckman, another of the victim's daughters, went with her grandmother to her mother's apartment several days after the funeral to get clothes for her younger sister. Ms. Beckman testified that while she was there, she found a blood-stained towel in the kitchen closet.

An expert called by the defendant testified that, based upon her investigation eleven months after the murder, blood droplets, which, in her opinion, matched the victim's blood type, were found in the hallway of the apartment building.

One person's name is mentioned repeatedly during the trial in connection with the victim. That person is Russell Healy. A neighbor testified that she had previously overheard Healy threatening to kill Alene Courchesne. Healy was the brother of the victim's fiancé. At one time he resided at the victim's apartment building and was a regular visitor. He admits stopping at the victim's apartment twice on the night of the murder, once at about 8:30 or 9:00 and once at 11:00, attempting to purchase cocaine. Other witnesses place him at the apartment at different times during the day and night. The victim's youngest daughter alleged that the voice she heard in the apartment on the night of the murder sounded like that of Russell Healy.

Healy testified at the defendant's trial. His testimony before the jury provides no explanation of his whereabouts during the likely

time of the victim's death. He also testified that on the night of the murder he saw the victim cut herself while shaving and that she used a towel to wipe off the blood. The autopsy revealed no cuts on the victim's legs.

Considering the evidence presented at trial, one might reasonably conclude that Richard McCue, more likely than not, was responsible for the death of Alene Courchesne. But, as previously noted, the State must prove the defendant's guilt beyond a reasonable doubt. Further, in cases such as this, where the State's evidence that the defendant committed the murder is entirely circumstantial, such evidence "must be viewed with caution and weighed with scrupulous circumspection," and must be "well connected and exclude every reasonable hypothesis except the guilt of the defendant. . . ." *See* 40 AM. JUR. 2d *Homicide* § 426 (1968).

Concluding as I do that the circumstantial evidence, even when viewed in a light most favorable to the State, could lead to rational conclusions other than the defendant's guilt, I would hold that the State has not met this burden of proof. For this reason, I respectfully dissent.